# THE SUPREME COURT

OF

## PENNSYLVANIA.

### WESTERN DISTRICT—PITTSBURGH 1878.

87   343
200   594
f200   595
200   596

## Commonwealth *ex rel.* Chase *versus* Harding *et al.*

1. The fact that art. 5, sect. 5, of the new constitution, provides that "whenever a county shall contain forty thousand inhabitants, it shall constitute a separate judicial district, and shall elect one judge learned in the law," does not of itself constitute a separate district, when a county attains that number of inhabitants, but simply indicates a certain basis, upon which at the proper time and in the proper manner judicial districts may be created by the legislature.

2. The proper time at which to create these judicial districts is at decennial periods, as provided in the 14th section of the Schedule to the Constitution, as follows: "The General Assembly shall, at the next succeeding session after each decennial census, and not oftener, designate the several judicial districts as required by the constitution." At such periods the counties which have reached the constitutional requirement can be declared by law to have arrived at the period of separation from all others judicially, and the way prepared for passing into the new relation.

3. The effect of the 13th section of the Act of 1878, is to suspend the erection of the new county, as to judicial purposes, until a proper constitutional provision can be made for the organization of the new county, in the mode the constitution provides for such county.

4. Where a county entitled to an Orphans' Court is divided, under the Act of 1878, the jurisdiction of said court is confined to the old county. The new county is not entitled to a separate Orphans' Court, but under the constitution, the judges of the Common Pleas become the judges of the Orphans' Court, and the register of wills is entitled to all the ordinary powers of the office at law, and does not become the clerk of the Orphans' Court, as in a county entitled to a separate Orphans' Court

October 7th 1878. Before AGNEW, C. J., SHARSWOOD, MERCUR, GORDON, PAXSON, WOODWARD and TRUNKEY JJ.

(343)

[Commonwealth *ex rel.* Chase *v.* Harding.]

This was an·application to the Supreme Court for a mandamus by the Commonwealth, *ex relatione* Aaron A. Chase, against the several judges of the courts of Luzerne county, to compel them to meet and organize the new courts of the new county of Lackawanna, which had been created out of a portion of the old county of Luzerne.

The petition set forth that the relator, Aaron A. Chase, is a citizen and tax-payer of the county of Luzerne, residing in that portion which has been designated a new county, called Lackawanna, and that he has a judgment of record in said Luzerne county which is a lien on lands lying in said proposed new county of Lackawanna, which he is· desirous of proceeding to collect; and that he has unliquidated demands against persons residing in said county which he wishes to reduce to judgment.

That by virtue of an act entitled, "An Act to provide for the division of counties of this Commonwealth, and the erection of new counties therefrom," approved April 17th 1878, an application was filed with the Secretary of Internal Affairs, by citizens of Luzerne county, for a division of said county, and the erection of a new county to be called Lackawanna, and commissioners were appointed, who performed their duties under said act; an election was ordered by the Governor and duly had, at which a majority of the votes cast was in favor of the proposed new county, whereupon the Governor issued his proclamation declaring the same on the 21st ·day of August 1878, and appointed officers for the said county.

Whereupon, by the requirements of said act, it became the duty of Hon. G. M. Harding, Hon. John Handley, Hon. Wm. H. Stanton and Hon. D. L. Rhone, they being the judges of the several courts of Luzerne county, to meet on the second Monday thereafter, to wit, on the second day of September 1878, and organize the courts of said new county of Lackawanna, fix the number of terms and return days, and do all things necessary in the premises and preside over and hold said courts, the said new county of Lackawanna belonging by the terms of the said act, to the Eleventh Judicial District, of which the defendants are judges. Yet the defendants have refused and still do refuse to meet and perform the duties aforesaid, or any of them. ·Whereof, your petitioner is liable to suffer great loss and damage by reason of his inability to know certainly in what court or county, or in what manner to pursue his remedies against his debtors.

Your petitioner, therefore, prays that a mandamus may be issued to the said G. M. Harding, John Handley, Wm. H. Stanton and D. L. Rhone, commanding them to meet and organize the courts of the said new county of Lackawanna, fix the number of terms and return-days, and do all things necessary in the premises and to preside over and hold the said courts.

[Commonwealth *ex rel.* Chase *v.* Harding.]

The material sections of the Act of April 17h 1878, Pamph. L. 17, Purd. Dig. 2102, as applicable to this case, are as follows :

Sect. 1. Be it enacted, &c., That whenever any county of this Commonwealth shall attain to a population of one hundred and fifty thousand or more, or that has already reached the same, it may be divided, and a new county erected therefrom, upon consent of a majority of the qualified electors of the proposed new county district voting at an election to be called for such purpose.

Sect. 2. Persons desiring the erection of a new county, as aforesaid, shall file in the office of the secretary of internal affairs an application, setting forth the name of the county proposed to be divided, its area in square miles, and the population at the preceding United States census, a particular description of the boundary line of the proposed division, and the distance of the nearest point thereof to the county seat, the name of the proposed new county, the names of the towns and municipalities or parts thereof that will be included, its number of square miles and population; said application shall be signed by not less than one thousand of the taxable inhabitants of the said proposed new county district, and shall be verified by the oath of not less than six qualified electors.

Sect. 3. Whereupon the secretary of internal affairs shall immediately notify the governor and the secretary of the Commonwealth, who, together with the secretary of internal affairs, shall immediately consider said application, and if it shall conform to the constitutional requirements respecting the erection of new counties, they, or a majority of them, shall forthwith appoint three disinterested commissioners, not residents of the county affected, to inquire into and make report concerning the same.

Sect. 4. Said commissioners shall be sworn to perform their duties with fidelity, and they or a majority of them shall forthwith cause an accurate survey of said proposed new county district to be made, and establish and mark the boundary line of division of the old county; they shall estimate as nearly as possible the population of the proposed new county district, and within sixty days from the time of their appointment shall file in the office of said secretary of internal affairs an accurate report of all the facts in the premises, together with an accurate map of the proposed new county; if it shall appear from such report that said new county may be established without conflicting with the constitutional provisions as to territory, population, and the nearest distance of the boundary line to the county seat, then the governor shall issue a proclamation ordering an election to be held by the qualified voters of the said proposed new county district.

Sect. 11. The governor shall immediately appoint and commission for the new county the necessary county officers, as provided by law, who shall perform the duties, have the power and be subject to the like qualifications as have county officers of this Com-

[Commonwealth *ex rel.* Chase *v.* Harding.]

monwealth, and shall continue in office until the next general election, and until their successors shall be duly elected and qualified.

Sect. 13. The judicial, senatorial and representative districts shall, for the time being, remain unchanged; and on the second Monday after the proclamation of the governor establishing said new county, the judges of the several courts of the said county, or a majority of them, shall meet and organize the several courts thereof; they shall determine and fix the number of terms, return-days, and do all things necessary in the premises, up to which time the power, authority and jurisdiction of the officers of the old county over said new county district shall remain unabridged, but from thenceforth shall cease and determine, except as to judges of the courts.

Sect. 14. The lien of all mortgages, judgments, mechanics' liens, verdicts, and all records which shall have been made and entered in the original county, up to and including the day of the organization of said courts, shall not be affected by the establishment of said new county, but to proceed thereon certified copies thereof shall be made by the prothonotary or other proper officer, which shall be entered by the like officer of the new county, and like proceedings had as in the original.

On the 6th of September 1878, a rule was granted to show cause why a writ of mandamus should not issue as prayed for, and on the 26th of September 1878, Judges Harding, Handley and Stanton filed their answer, which admitted the facts as set forth in the petition, and then averred, "that our refusal to comply with the apparently plain mandate of the statute referred to by the relator, is based not upon any desire or thought on our part to avoid the discharge of official duty, but solely and exclusively upon the fact that immediately after the county of Lackawanna was created agreeably to the statute, to which the relator has referred at length in his petition, His Excellency, John F. Hartranft, Governor of Pennsylvania, acting doubtless in pursuance of some proper warrant or authority, or supposed proper warrant or authority, appointed and commissioned the Hon. Benjamin S. Bentley to be president judge of said county.

"We would further add that when the time arrived for the discharge of the duties enjoined upon us by the provisions of the act under which the said Lackawanna county was created, the said Benjamin S. Bentley, having taken the proper oath of office as president judge, pursuant to his said appointment and commission, was present in said county, and, as we are informed and believe, then and there assumed and took upon himself, and still continues to assume and take upon himself, all and every of the judicial duties appertaining therein and thereto, notwithstanding the fact that the statute creating the said county, in plain terms, as it would seem, imposes the discharge of said duties upon us."

[Commonwealth *ex rel.* Chase *v.* Harding.]

A copy of the appointment and commission of Benjamin S. Bentley, dated August 22d 1878, was appended to this answer.

Judge Rhone, of the Orphans' Court, filed a separate answer, as follows:—

"That so much of the relator's statement in the second paragraph of his petition as relates to the passage of the Act of Assembly cited by him, and the various proceedings in pursuance of such act, are true; but he alleges as matter of law, that the balance of the relator's statement, as contained in the second paragraph of his petition is untrue, so far as it relates to the organization of a county called 'Lackawanna,' and the duties of your respondent in the premises, for the reasons following, to wit:

"1. That John F. Hartranft, Governor of the Commonwealth of Pennsylvania, has appointed and commissioned Hon. Benjamin S. Bentley, judge of the several courts of the county of Lackawanna, including the Orphans' Court, as stated by the Hon. G. M. Harding, Hon John Handley, and the Hon. W. H. Stanton, in their answer to the proceeding, and that your respondent is informed and believes the said Benjamin S. Bentley has organized and is holding the said Orphans' Court of Lackawanna county.

"2. That the Act of Assembly cited by the relator does not establish a separate Orphans' Court in said county of Lackawanna, and that your respondent is not appointed, commissioned, or otherwise authorized by law, to organize or hold any other court than that of a separate Orphans' Court for the county of Luzerne.

"Your respondent, further answering, saith that for the reasons stated, and none other, he hath refused and still doth refuse, to go to the county of Lackawanna and organize an Orphans' Court or assist in organizing the other courts thereof."

*H. W. Palmer* and *Stanley Woodward,* for the plaintiff.—The action of the executive in assuming the existence of a new district, and in appointing a judge, is based entirely upon what we regard as a misconstruction of art. 5, sect. 5 of the constitution of 1873, which is in the following language: "Whenever a county shall contain forty thousand inhabitants, it shall constitute a separate judicial districts, and shall elect one judge learned in the law," &c. This section, whether judged by the ordinary rules of construction applied to constitutions, as fundamental law, or by the subsequent provisions of the same instrument, is merely directory. It assumes a certain basis upon which, at the proper time and in the proper manner, judicial districts are to be erected by the legislature, but it does not create the districts. This, under all our constitutions, has been the duty and function of the legislature alone: Commonwealth *v.* Clark, 7 W. & S. 127; Commonwealth *v.* Maxwell, 3 Casey 460. Again, if the section is an independent and self-executing enactment it should be more specific in its provisions.

It prescribes no method to ascertain the requisite 40,000 population. How is the executive to be informed on this point? Suppose an election should make it clear that in a given county there were more than 40,000 people, can the governor proclaim it a new judicial district and appoint a judge to preside over its courts? Since the adoption of the constitution there are doubtless counties which have increased from less to 40,000 population. Does this fact authorize the executive to proclaim them separate judicial districts?

But section 13 of the Schedule to the Constitution directs, "The General Assembly shall, at the next session after the adoption of this constitution, designate the several judicial districts as required by this constitution." This section was evidently designed to set in motion the machinery of the new system, and in pursuance of it the legislature enacted the Act of April 9th 1874, under which the county of Luzerne was again designated as the Eleventh Judicial District. Nor is this all. As if to render doubt impossible, the very next, or 14th section of the schedule provides: The General Assembly shall at the next succeeding session after each decennial census, *and not oftener*, designate the several judicial districts as required by the constitution."

It would seem clear then, that the territory embraced in the Eleventh Judicial District, on the 9th of April 1874, when it was duly organized as a separate district in pursuance of law and in the manner prescribed by the constitution, still remains the Eleventh Judicial District. It is not claimed that any legislative action has intervened to create a new district. But it is alleged that in some way, by the automatic effect of the constitution itself, the erection of a new county has resulted in the creation of a new judicial district. We answer in a two-fold way. We say first, this cannot be, for the reason that the constitution cannot, and does not execute itself; and secondly, that by the very terms of the constitution itself, judicial districts are to be designated by the legislature after each decennial census, *and not oftener*.

It may be objected to this view of the case, that the framers of the constitution had in mind only existing counties, and did not contemplate the application of the 14th section of the schedule to new counties to be organized out of parts of old ones. To this it may be answered that while the power to "designate districts," is to be exercised only at stated intervals, the right to attach counties new or old to districts already existing, is quite a different right, and is not infringed. Grant then, for the sake of argument, that the members of the constitutional convention had specially in view old counties only, it still remains true, that a new county may, for the time being, be attached to a judicial district already existing, and await the decennial census for separate organization as a district.

If section 13 of the Act of 1878, means anything it is:

[Commonwealth *ex rel.* Chase *v.* Harding.]

1. That the judicial district in which the new county is located, is to remain unchanged, until legally altered.

2. That the judges now in office, or a majority of them, are to meet on the second Monday after the proclamation of the governor, establishing a new county, and organize the several courts thereof.

3. That until the judges have so met, and organized the courts, the power, authority and jurisdiction of the old county officers over the territory of the new county, remain unabridged; but that thereafter the new county officers are to exercise their respective functions.

4. The judges of the courts are especially excepted, and are distinctly recognised as the judicial officers of the new county.

Under the 13th section of the Act of 1878, the judges of the county of Luzerne were compelled to organize courts in the new county. The judges failed so to do, and refused when requested. They make answer the appointment of Judge Bentley. The most obvious course for us would have been by writ of quo warranto before Judge Bentley, but it was doubted whether under the constitution he had a jurisdiction over the state.

*Alfred Hand, Cornelius Smith* and *E. Merrifield,* for the Bar of Lackawanna county.—The Act of 1878 is not a special but a general law. The report of the commissioners set forth the population of the old and the new county so that the facts as to population are on record. The requirements of this act are in perfect harmony with the constitution. The governor, finding that the population was 40,000 persons, established a special judicial district, being obliged to do so by the constitution, and finding nothing in the act against it. Under the act the executive has a right to commission a new judge, and this judge would hold the courts in the new county. The governor simply filled a vacancy created by the Act of Assembly. The legislature has the power to ascertain whether a county has a right to a new judicial district before the decennial census, and it has done so in the act. This act is to create new counties, and in their creation a new judicial district springs up as provided by the constitution. Judge Bentley is not a party to this cause. A quo warranto would lie against the judges of the county having jurisdiction over the state.

Is the plaintiff entitled to this writ, and can the judgment be amended so as to remedy the difficulties complained of? Has the relator a clear legal right to have done that which he seeks? Has he any other remedy? What business is it of the relator whether the title of the officers of the county is a good or bad one. It is nothing to him whether the judge is *de jure* or *de facto*. If it is his business he should have raised the question directly and not collaterally. There is no difficulty in applying for a writ of quo warranto, and Judge Bentley could have heard the case or called in

[Commonwealth *ex rel.* Chase *v.* Harding.]

another judge.   If the organization of the courts is not proper let him test that legally.

[C. J. AGNEW.—The constitution did not require that upon the creation of the offices that there should be an immediate right to appoint.]

. It created a vacancy.   The moment a county was created the office was established, and a vacancy at once occurred which could not be filled until the time for election fixed by law, and meantime the governor had the right to appoint.

As a legal proposition we have no hesitancy in saying the first part of sect. 5, art. 5 of the constitution does execute itself.   The moment Lackawanna county was established, and it was legally and officially ascertained that it contained a population of more than 40,000 inhabitants, the two facts necessary to set in motion and operation the constitution were established.   The result of such operation was a separate judicial district, and the election of a judge learned in the law as a constitutional right.   The election of a judge necessitated the appointment of a judge by the governor.

Sect. 14 of the schedule refers alone to the designation of districts, not their creation, except so far as sect. 5, art. 5 provides for the creation out of the counties not constituting separate districts. It in no way interferes with the creation of districts by the constitution.   The new county act provides for the appointment of commissioners to ascertain whether the constitution has been complied with, and their ascertainment settles that question for all purposes of the constitution.

On the 14th of October 1878 the Supreme Court made the following order, the opinion to be filed thereafter :

PER CURIAM.—And now, October 14th 1878, it is ordered that a writ of peremptory mandamus issue to Garrick M. Harding, president, and John Handley and William H. Stanton, additional law judges of the Court of Common Pleas of the Eleventh Judicial District, forthwith to meet and organize the several courts of the new county of Lackawanna, and perform all the duties enjoined upon them in and by the Act of General Assembly of the 17th of April A. D. 1878 ; and as to the said D. L. Rhone, judge of the Orphans' Court, the said rule be discharged.

Chief Justice AGNEW delivered the opinion of the court, November 21st 1878.

The principal question, and turning point of this case is, whether the new county of Lackawanna became a separate judicial district under the fifth section of the fifth article of the new constitution immediately upon its erection, and by that fact ; or whether it remains within the Eleventh Judicial District, according to the pro-

vision in the 13th section of the Act of 17th April 1878 (Pamph. L. 17), and must be organized under it. The 5th section of the 5th article reads thus : "Whenever a county shall contain forty thousand inhabitants it shall constitute a separate judicial district, and shall elect one judge learned in the law ; and the General Assembly shall provide for additional judges as the business of the said district may require. Counties containing a population less than is sufficient to constitute separate districts shall be formed into convenient single districts, or, if necessary, may be attached to contiguous districts, as the General Assembly may provide. The office of associate judge, not learned in the law, is abolished in counties forming separate districts ; but the several associate judges in office when this constitution shall be adopted shall serve for their unexpired terms." This section, it will be seen, has no relation to new counties, but operates on all counties, old and new, according the number of inhabitants in them, and affects existing districts, as already arranged by law. The new constitution found the state already districted, and therefore to be re-districted before it could take effect. Under this section the organization of separate districts consisting of a single county, and that of single districts composed of several counties are different ; the former having but one judge who holds all the courts alone, and additional *law* judges when necessary for the dispatch of business ; the latter having three judges, one of whom, the president, is learned, and the other two not learned in the law ; the president being a judge of every county in his district, and the associate judges only of one county. The number of inhabitants in a county is an unknown fact, except as it may become known through the decennial census taken by the United States. This connects the question with the 14th section of the schedule, which will be noticed presently. Now it is obvious that as the 5th section referred to operates upon an existing arrangement of districts throughout the state, and as counties having a population less than forty thousand are necessarily comprehended with others in districts having a president judge, who presides in each and every county of the district, a most uncertain and confusing state of judicial affairs, followed by ruinous consequences, would happen, if, whenever a county reached the number of forty thousand inhabitants, it became *ipso facto* a separate judicial district, by the simple mandate of the 5th section of the 5th article, and without preparatory legislation. Its organization would change *instanter ;* the associates not learned in the law, elected and commissioned long after the adoption of the constitution, dropping out ; and the president of the whole district becoming the sole judge in the new district. There would arise perplexing questions of jurisdiction likewise, if the fact of the required population determines the operation of the constitution, and not its legal ascertainment by an act of legislative power. If the *fact* determines, then

the *time* of the fact also governs, and who shall (outside of the legal mode) determine when this took place? And if it had taken place long before the change in organization took place, what effect will the acts of associates have, acting after their offices expired by virtue of the very terms of the same section? It is evident that if the constitution executes itself, without legislative aid to determine the number of inhabitants and prepare the way for the passage of the county, having the required population, from the old into the new relation, the confusion would be inextricable, and the consequences ruinous. It is also obvious, as the constitution is not confined to new counties, but applies to old and new, that the latter must follow the same rule.

Now we are prepared to see the relevancy and effect of the 14th section of the schedule, which seems to be out of place, but which has no ambiguity in its interpretation. It reads thus: "The General Assembly shall at the next succeeding session after *each* decennial census, and *not oftener*, designate the several judicial districts, as required by this constitution." The italics I have made mark its operation. The duty recurs after *each* census, but *not oftener*. It is evident the convention intended to confine the *arrangement* of districts to *decennial* periods when the *census* would authoritatively, and with certainty, declare the population of each county. These counties having reached the constitutional requirement, can be declared by *law* to have arrived at the period of *separation* from all others judicially, and the way prepared for passing into the new relation. Thus the provisions of the 5th section of the 5th article, and the 14th section of the schedule harmonize with each other, and the *separation* of a county from all others to form a district by itself, under a new and different organization of its courts, becomes a matter of certainty, and innocuous adaptation to other relations and counties; and this shows also that the argument founded upon the *estimate* of the population, by the commissioners appointed under the Act of 17th April 1878 is inapplicable. The purpose of that estimate is declared by the act itself. The report of this commission is expressly stated to show whether the new county can be erected "without conflicting with the constitutional provisions as to territory, *population* and the nearest distance of the boundary line to the county seat." The *estimate* is but a part of their report for this special purpose, and was not intended by the legislature for a different purpose, while no provision was made in the act for the execution of a different purpose, the 13th section, on the contrary, retaining the new county within the Eleventh Judicial District. It is manifest that an estimate is not a census, and is to *precede* the erection of the county, and not to affect its character as a judicial district *after* it has been erected. Thus it is evident the estimate was no foundation for the exercise of any executive function, either by way of declaring the county a *separate*

[Commonwealth *ex rel.* Chase *v.* Harding.]

judicial district or of appointing its officers. The power of separation is legislative, to be exercised at the time when the constitution provides, and not executive.

It follows from these views that when the new county came into existence as a part of the Eleventh Judicial District, having a president judge already in commission, there was no vacancy in that office to be filled, and nothing upon which the commission of the governor could take effect. He might as well attempt to issue a commission to fill Judge Pearson's place in Dauphin county. Having no power to appoint, the commission to Judge Bentley was waste paper and void. He is not even a *de facto* judge, there being no office to be filled, no commission to be issued, and no authority in the governor to act. Even a *de facto* officer must have some color to act. There was no separate district, and the character of the county in its *judicial* aspects had not been changed. The Act of Assembly gives no color, but the contrary, and the commission has not the sanction of law. It is better, therefore, to grant the mandamus at once than to suffer new complications to arise by delay.

But the mandamus cannot go to the judge of the Orphans' Court, whose jurisdiction after separation is necessarily confined to his own county, Luzerne. The new county is not entitled to a separate Orphans' Court, but under the constitution the judges of the Common Pleas become the judges of the Orphans' Court, and the register of wills will be entitled to all the ordinary powers of the office at law, and he does not become the clerk of the Orphans' Court, as in a county entitled to a separate Orphans' Court. The 22d section of the 5th article makes the creation of a separate Orphans' Court a subject of express *legislative* power; while the Act of 17th April 1878 has not only provided no such Orphans' Court, but has said nothing about the judge of the Orphans' Court in the provision for organization. There can be no assumption, therefore, of the creation of a separate Orphans' Court in the new county. The effect of the erection of the new county was to make the judges of the Common Pleas the judges of the Orphans' Court, to confer on the register of wills the actual power, and to limit the jurisdiction of Judge Rhone to his own county. He cannot constitutionally be a judge in *two* counties, one of which is not entitled to a separate Orphans' Court. The mandamus cannot go to him. But while Lackawanna is not a separate judicial district, its *organization* presents more difficulty, owing to its peculiar relations. The constitution has made no provision for the effect of the division of a separate judicial district consisting of a single county. The organization of such a separate district is constitutionally different from that of a county connected with others. In the separate district *one* judge learned in the law fills all the courts without associates. *Additional law* judges may be given for the dispatch of business,

6 NORRIS—23

[Commonwealth *ex rel.* Chase *v.* Harding.]

but not ordinary associates. But a county connected with others is entitled to *three* judges, one the president of the courts of all the counties in his district, and the other two associates, not learned in the law, in the single county, and not in the others. This raises the question, how far the *additional* judges of Luzerne county can be made temporarily associate judges of Lackawanna county, a seeming anomaly. It is clear that the 13th section of the Act of 1878 retaining, "for the time being," the new county in the Eleventh Judicial District, and directing the judges of that district to organize the courts of the new county, *does* carry in the additional as well as the president judge. This compels us to meet the difficulty already presented, the want of any constitutional provision for the separation of a separate single county district into two parts, one of which is not entitled to a separate judicial district organization. It is evident, under the new constitution, that there is no such thing as a separate single county judicial district, consisting of *two* counties entitled to *different* organizations. The thing is not only an anomaly, but contradictory. The power to divide Luzerne county, though a separate judicial district, is undoubted; and, therefore, the repugnancy existing in the constitutional provisions for erecting new counties, and creating separate judicial single county districts, must be resolved upon the general powers conferred upon the legislature. The power to create new courts to supply the wants of the state is undoubted: 1st sect. 5th art.; Green's Case, 8 P. F. Smith 226. The power to create new counties is clear, under the 1st section of the 2d article. The prohibitions in the 13th article do not touch this question, while they imply all other unexcepted necessary powers. We have, therefore, a case within the general powers of legislation, not forbidden by any special provision, and necessary for temporary organization, to comply with the mandate of the 11th section of the Declaration of Rights, that all courts shall be open, and all persons shall have remedy by due course of law and justice administered without *denial* or *delay*. Now, in substance, this is nothing more than to hold that the effect of the 13th section of the Act of 1878 is to suspend the erection of the new county, as to judicial purposes, until a proper provision can be constitutionally made for the organization of the new county in the mode the constitution provides for such a county. If this cannot be done, then a constitutional anomaly has arisen for which there is no remedy, and a single county, constituting a separate judicial district, cannot be divided; a consequence we cannot admit, in view of the general legislative power over the subjects of the courts and new counties. We are of opinion, therefore, that the temporary organization of the courts of Lackawanna county, under the 13th section of the Act of 1878, is constitutional and proper, and that the rule for a mandamus as to the judges of the Court of Common Pleas of Luzerne county must be made absolute, but must be discharged as to the judge of the Orphans' Court.

[Commonwealth *ex rel.* Chase *v.* Harding.]

Before the opinion was filed in this case, Hon. Benjamin S. Bentley petitioned the Supreme Court as follows:

" That he is president judge of the several courts in and for the county of Lackawanna; that in accordance with the Act of Assembly, said county was erected, containing a population of more than 40,000. That thereby its judicial connection with the county of Luzerne was severed, and a vacancy created in the office of president judge of the several courts of record. That on the petition of members of the bar and many citizens of Lackawanna county, Governor Hartranft appointed and commissioned petitioner to be president judge of the several courts of record in and for the county of Lackawanna. That the petitioner accepted the same, took the oath of office, and changed his residence in obedience to the requirements of the constitution, by removing from the city of Williamsport, Lycoming county, Pa., to the city of Scranton, in the county of Lackawanna. That he relinquished the practice of the law and placed his business permanently in other hands. That he organized the several courts of said new county of Lackawanna, fixed and determined the number of terms and return-days, and all things necessary in the premises.

" And your petitioner cannot but feel that he is entitled, as a matter of courtesy, if not of right, to be put upon record as a party, and be heard in any proceeding affecting him personally and officially in so large a degree.

" Your petitioner, therefore, prays that he be made a party in this proceeding, that a re-argument be granted, and a rule to show cause why the mandamus heretofore issued shall not be vacated.

On the 21st of November 1878, this court refused the petition, in an opinion saying,

PER CURIAM.—Since the opinion was written in this case, and before filing it, Mr. Bentley has petitioned us to be permitted to become a party, and to be heard against the mandamus heretofore ordered to be issued, and under which the judges of Luzerne county have already acted. We fail to perceive any mode by which he can become a party to the legal proceedings against the judges of Luzerne county. Yet we have examined the reasons set forth in his application with care to see whether we ought to have arrived at a different conclusion in the mandamus case and find none.

Nevertheless, we look upon his case as one of hardship, deserving legislative relief for the injury he has suffered by accepting a commission not asked for, and erroneously issued without fault on his part.

The prayer of his petition is refused.